MEMORANDUM OF DECISION, STATE TRIAL REFEREE.
These consolidated petitions for the termination of the parental rights were filed by the Department of Children and Families ("DCF") seeking to terminate the parental rights of the biological mother and fathers of Christopher L., Scott L., and Alicia L.
The mother of all three children is Shelly D. As to the mother, the Department initially alleged the children have previously been adjudicated neglected and the mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of each of the children, the mother could assume a responsible position in the life of each of the children. General Statutes § 17a-112 (c)(3)(B). By amendment to the pleadings, the Department also alleged that the three children had each been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for their respective physical, educational, moral or emotional well-being. General Statutes § 17a-112 (c)(3)(C).
The father of Christopher L. is Christopher L. The father of Scott L. and Alicia L. is Scott L. As to both biological fathers, the Department alleges, as to their respective child[ren] that (1) the father has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the child; General Statutes § 17a-112 (c)(3)(D); and (2) the child has been abandoned by the parent in the sense CT Page 6452 that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. General Statutes § 17a-112 (c)(3)(A).
The petitions for termination of these parents' rights in these three children were filed on January 29, 1998. Amendments to the petition were granted on February 4, 1999. That, therefore, is the adjudication date. Trial commenced on these matters on March 1, 1999. The final day of trial was March 18, 1999.
 ADJUDICATION
This action involves the four youngest children of the mother. She has two older children who are not subjects of this action. They result from her marriage to their father. These children, Eric D., born December 19, 1985 and Kevin D., born June 22, 1967 are both committed to the custody of the Commissioner of DCF. They are occasionally referred to throughout these proceedings. They are each placed in a residential facility at the present time.
The Fathers
DCF claims that Christopher L. and Scott L. have abandoned their children within the meaning of the statute. Abandonment focuses on the parent's conduct. In re Michael M.,29 Conn. App. 112, 614 A.2d 832 (1992); In reRayna M., 13 Conn. App. 23, 36, 534 A.2d 897 (1987);In re Kezia M., 33 Conn. App. 12, 632 A.2d 1122
(1993). "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility' for the welfare of a child." In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054
(1985); In re Migdalia M., 6 Conn. App. 194, 208-209.504 A.2d 532 (1986).
DCF also claims, as to each of these biological fathers, that they have no ongoing parent-child relationship with their respective children, as defined by statute.
"It is reasonable to read the language of `no on-going parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has CT Page 6453 ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been displaced. In either case, the ultimate question is whether the child has no present memories or feelings for the parent." In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670, 420 A.2d 875 (1979).
 "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." (Internal brackets added) In re Migdalia M., 6 Conn. App. 194, 211, 504 A.2d 532 (1986); In re Juvenile Appeal (84-3), 1 Conn. App. 463, 473, A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984); In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670-671, 420 A.2d 875 (1979).
Christopher L., the father of his namesake, was served by publication in the Tampa Tribune, a newspaper having general circulation in the New Port Richie/Hudson area of Florida where he was last known to live. DCF also tried to locate him through inquiries of the mother, the telephone listings, and the Florida equivalent to DCF, Florida support services, and the Internet. The court finds that DCF has made diligent efforts to locate Christopher L, and, a default enters as to him.
The mother and Christopher L. began living together in the fall of 1989. The mother has reported that he was physically abusive of her and her oldest two boys. The Florida Protective Services received reports of his physical beatings of the children in the winter of 1989. While the mother was pregnant with their child, she and Christopher L. moved to North Carolina. While there, North Carolina received a referral claiming that he and the mother were abusing and neglecting the two boys. Christopher L. was born on November 1, 1990. Within two months of his birth, North Carolina authorities received two more referrals regarding domestic violence and child neglect. They then moved back to Florida. The mother was forced to stay in the home by Christopher L. where he physically abused her. He punched her, kicked her, pulled her hair and threatened her. He was physically abusive of her sons, particularly Eric. She was not permitted outside the home with their son. Ultimately, she left with only the two older boys. She moved in with Scott L. After several CT Page 6454 weeks passed, he assisted her in going over to Christopher L.'s home and retrieving the child, Christopher. Thereafter, Christopher L. did not have contact with his son. The child has not seen his father since he was about two years old. During the two and one half years the mother lived with Christopher L., he sexually molested her two boys, Eric and Kevin. The mother states she was never aware of it until Eric told her in 1994. The court finds that DCF has proven by clear and convincing evidence that Christopher L. has no ongoing parent-child relationship, at all, with young Christopher. The court also finds that DCF has proven by clear and convincing evidence that Christopher L. has abandoned young Christopher in the sense that the biological father has not demonstrated any concern, interest in, or responsibility for young Christopher. It is not in Christopher's best interest to allow time for that relationship to be established.
Scott L. was served with notice of these proceedings by certified mail to him in New Port Richy, Florida. The restricted delivery receipt is signed by Scott L. He was also served by publication in the Tampa Tribune, a newspaper of general circulation in the New Port Richy, Florida region. He personally appeared before the regional juvenile court on February 27, 1998. He had actual knowledge of the proceeding; he chose to not participate. He has a history of repeated arrests and incarceration for offenses of theft and serous assaults. He abuses alcohol. He was physically abusive of the mother. Their relationship began in 1992. Their son, Scott, was born November 8, 1992. Their daughter, Alicia, was born March 28, 1994. They lived together throughout the intervening time. The mother complained to state authorities where they were living in Florida that he was physically abusive of her and her children. The father remained physically abusive of the mother. When she was pregnant with Alicia, he was jailed for aggravated assault on her. She bailed him out with her children's Social Security funds and went back to him. In April, 1994 the police became involved: he had thrown the mother out of the house and chained himself in the house with all of the children. The mother's oldest boy Kevin was injured during this incident. On April 20, 1994, Florida authorities removed all of the children from the home. Prior to removal Florida authorities had documented the home maintained by the mother and Scott L. to be filthy, with fecal matter and urine about the premises. Prior to removal the family had received Florida intensive family services. Sometime after the children's removal from her home in 1994, the mother ceased her relationship CT Page 6455 with Scott L.
The mother, and the children, Scott L. and Alicia L. had no communication with the father Scott L. from some time in 1994 until 1998. In February, 1998 while these proceedings were pending Scott L. came to Connecticut. He wanted to talk with the mother's sons, Eric and Kevin. She communicated this to Eric at his residential facility. Neither through the regional juvenile court nor through the mother did he attempt to follow through on reestablishing a parent-child relationship with either of his two children.
The court finds that DCF has proven by clear and convincing evidence that Scott L., the biological father, has abandoned young Scott L. and Alicia L., and, has shown no interest, concern in or responsibility for their respective well-beings. The court also finds that DCF has proven by clear and convincing evidence that Scott L., the biological father has no ongoing parent-child relationship with either young Scott L. or Alicia L., and, that it would not be in either of their best interests to allow time for the father to establish such a relationship.
The Mother
As to the mother, DCF claims that (1) all these children having been found neglected, she has failed to achieve such a degree of personal rehabilitation as would encourage the belief, considering the age and needs of each of the children, that she could assume a responsible position in each of their lives; and (2) that by reason of her acts of omission or commission each of the three children have been denied the necessary care, guidance or control necessary for their respective physical, emotional, moral or education well-being.
Shelly D. is the mother of five children, the three youngest being the subject of these petitions. She was born in 1968. She was sexually abused as a child by her step-father, maternal grandfather and maternal great-grandfather. She was told to forgive and forget these horrors when she disclosed them to her mother. She has completed her education through the 8th grade. When she was 15 years old she became involved with the father of her two oldest boys. She quickly became pregnant with Eric. She married Eric's father after Eric was born, when she turned 16 years of age. That marriage has never been terminated. When she was 18 years old, Kevin was born. That child had suffered CT Page 6456 significant health problems as an infant, including a `failure to thrive diagnosis'. DCF (its precursor, DCYS) was involved with this family at that time because of a referral occasioned by the Failure to Thrive diagnosis. Throughout these early years, and before the three present children subject of this action were born, the mother's life was riddled with continual abuse by her husband. It was determined later that he sexually abused both Eric and Kevin while they were all living together.
The mother's early years after the birth of Christopher were, once again, punctuated by violence upon her by this child's father. She emerged from this destructive relationship only to dive into one equally bad with Scott L. Her neglect of the children and the violence in the household escalated until the children's (all five) removal by Florida authorities in April, 1994. Prior to their removal, services had been provided to the family. At the time of their removal by the State of Florida, Christopher was 3 1/2 years old, Scott was 1 1/2 years old, and Alicia was one month old. The children were adjudicated as dependent children within the meaning of the Florida statute governing the same. The children were placed in foster care. Thereafter, the mother worked with the Florida authorities toward her reunification with her children. She attended parenting classes and attended a domestic violence intervention program. She cooperated with other services provided to her. The youngest three children, Christopher, Scott and Alicia were returned to her about 10 months later. Thereafter, the older two children were returned to their mother's care. They then had protective supervision services from the state. These included in-home counseling services for the mother. The in-home counseling addressed issues of alcohol abuse, neglect, and excessive discipline. It was determined that in leaving Scott L. that she had made marked improvement. In December, 1995, the protective supervision services ended because the mother decided to move to Connecticut.
While the children were in foster care, the mother had entered into a relationship with another man named Marty H. The relationship commenced in the summer of 1994. Marty was a recovering substance abuser that the mother had met when she was staying in a homeless shelter after she had left Scott L. They started cohabiting while the children were in foster care. Marty moved with the mother and the 5 children to Connecticut in December, 1995. They moved in with the children's maternal grandmother. CT Page 6457
On December 12, 1995, the mother called the police for help with her children. She could not get them to go to bed, particularly the two oldest boys. These two boys commenced therapy through the local hospital. The boys' therapist mandated the mother contact DCF for help or he would refer the family there, himself. On February 14, 1996, mother contacted DCF for help with the two oldest boys who were aggressive, violent and defiant of her authority. Their therapist also contacted DCF because he was concerned about the mother's ability to caretake her children. He was also concerned about the safety of the three younger children around the two older boys. DCF commenced the provisions of services for this family. Supervision of the children remained a problem. Alicia, then 2 years old had to be treated for the extraction of a fish hook from her finger that impaled her while she was playing unsupervised. This occurred in March, 1996. A few days later young Christopher was observed with bumps and scrapes by the DCF worker. They were caused by one of their older brothers while they were unsupervised. The mother failed to consider that anything aggressive had occurred, accepting the older brother's explanation that Christopher fell down the stairs. In March, the mother was directed to get physicals and immunizations for Scott and Alicia that were past due. As of April 18, 1996 (the date the children were removed from the home) she still had not accomplished this task although DCF workers had reminded her and offered their long distance phone service to assist in the making of necessary preliminary calls. DCF was providing intensive family preservation (IFP) services. However, the IFP counselor reported to DCF that a high level of chaos remained in the home. The children remained largely unsupervised and undisciplined. On March 27, 1996, the mother's brother moved into the home with his wife and their four children.
On April 11, 1996, the mother entered into a service agreement with DCF toward the goal of maintaining a safe environment for the children. She agreed to maintain close supervision of the children to reduce injuries and aggression to each other, to cooperate with DCF recommendations for the maintenance of a safe home for the children, to follow through on recommendations for treatment whether emergency treatment in response to unsafe behaviors or weekly treatment. On that same date, the mother engaged in assaultive behavior with the children's maternal grandmother wrestling her to the ground and hitting her. On that same date, the social worker observed Scott CT Page 6458 and Christopher with bruises and scratches on their faces.
On April 16, 1996, the Intensive Family Preservation (IFP) worker described the home as bedlam and indicated that it was too much for the mother to handle and that she could not work with the mother under those conditions. On April 18, 1996, the therapist at the hospital working with the mother reported that the mother was unable to make proper parenting decisions and did not appreciate the risks of the children's aggressive conduct in their home. The therapist reported that the mother was so troubled herself that she was an ineffective parent. She recommended partial hospitalization for the mother. Thereafter, on April 18, 1996, the mother's five children were removed from the home. On April 22, 1996, an order of temporary custody was issued by the court as to all of the children, vesting their custody in the Commissioner of DCF. On that same date, DCF filed petitions alleging that the children subject of this action were neglected and uncared for.
The mother pursued five individual counseling sessions, largely in May, 1996, with a psychiatric nurse clinician at her local hospital. While she expressed motivation to cooperate in counseling, she felt wrongly accused by DCF of poor parenting of her children.
On June 6, 1996, the mother was admitted to the local hospital partial hospitalization program for one month. She attended regularly and consistently. She was evaluated by an attending psychiatrist there and diagnosed with an adjustment disorder with mixed anxiety and depressed mood. She was found to have dependent personality traits. While the bases of these diagnoses were not elaborated it was noted that the mother tended to minimize the importance of certain issues and claim to be unrealistically virtuous. It was recommended that she follow up on outpatient treatment. She went back to the psychiatric nurse clinician who had seen her previously, for one session individually and agreed to participate in group psychotherapy weekly beginning in mid-July, 1996. She stopped therapy with this group and individually two months later in September, 1996.
A court-ordered psychological evaluation was performed with the mother and all five children on October 31, 1996. The mother expressed that she did not understand why DCF had taken her children. She dwelled on the fact that the service agreement had provided her with thirty days to separate her family from her CT Page 6459 brother's family. She acknowledged that the children were all fighting and that it was chaotic at times with all of the children's different demands. She felt it was unfair that her children were taken from her.
The mother related that while the children lived with her, all of the children's fathers had hit her and two had been to prison. Two of them, and her current boyfriend Marty were substance abusers. She stated that her two oldest boys were physically abused by Christopher's father and one was sexually abused by him. She had been physically and sexually abused by her father, stepfather, and grandfather. Notwithstanding this history the mother told Dr. Mantell (the court-appointed psychologist evaluator) that she did not feel she required any form of professional care now except on an `as needed' basis.
After testing, Dr. Mantell determined that the mother's verbal IQ of 79 placed her in borderline range for intelligence. She sees herself as a victim and externalizes blame. She is very defensive. As a result of both intellectual limitations, her life experiences and personality, Dr. Mantell found the mother to have an inadequate appreciation for the problems of her children and how she is related to them. He found her overwhelmed by the day-to-day needs of children. While the mother showed affection to the children, she showed an inadequate understanding of their needs. Dr. Mantell stated that none of the three children should be returned to their mother's care.
On February 7, 1997, these children were adjudicated neglected and committed to the custody of the Commissioner of DCF for a period not to exceed on year. That commitment has been extended and remains in effect.
At the time that these children were committed (along with their two older brothers) expectations were issued by the court as orders to the mother. They were:
1. Keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney.
2. Visit the children as often as DCF permits and cooperate with visitation guidelines of Eric and
Kevin's residential placement. CT Page 6460
3. Participate in parenting counseling, individual counseling, and family counseling provided by
residential placement facility; sign releases as requested by DCF after review by attorney.
4. Secure/maintain adequate housing and income.
5. No substance abuse.
6. No involvement with criminal justice system.
7. Cooperate with DCF re parenting instruction regarding parent/child interaction and children's special needs.
The written expectations signed by the mother appraised her: "If you fulfill the court's expectations, you will improve your chances of regaining or permanently keeping custody of your child. Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption."
The mother moved several times since the expectations were issued. She was working at the time of the expectations continuously until the end of 1998. She lost her job and has been looking for work continuously.
In April, 1997, the mother expressed an unwillingness to follow a course of therapy. On May 9, 1997, she was referred by DCF to the `Parents With Mental Illness' program. It is an education program to heighten awareness of problems that can be dealt with in a therapeutic environment. There were delays in her processing of paperwork for this program. They resulted from the mother's lack of willingness, initially, to provide a full release of information to DCF and, also, to a lack of clarity of the mother's clinical diagnosis.
In the meanwhile, the mother had a clinical evaluation at the Hungerford Hospital. The counselor there sought to clarify a diagnosis for her through psychological testing. This resulted in a diagnosis of Obsessive Compulsive Personality Disorder. Her therapist at Hungerford Hospital observed that the mother had personality deficits (that she was intimidated by people in authority and uses poor judgment) and she had no insight into her deficits. The Parents With Mental Illness Program delayed her CT Page 6461 entry because this diagnosis did not shed sufficient light on her limitations that would be pertinent to their program. Ultimately that problem was solved and the mother was accepted for intake into the program on June 30, 1997. It was the therapist's conclusion from her interview with the mother that she did not accept responsibility for any of the problems that she or the children had. The mother assured the therapist that she supervises and disciplines the children very well. The therapist observed two of the mother's visits with her children. She observed the mother force a frightened Alicia to hold and smash a water balloon on the ground. The mother did not understand Alicia's needs or respect Alicia's wishes.
The mother did not participate in the Parents with Mental Illness Program because she could not agree with the therapist on any particular issues she should address. Those that were provided by her worker were rejected by her as not in need of further therapy. It had been recommended that she work on setting appropriate boundaries for her children when actually parenting them. She felt she was doing this well and did not need to work further on it. The mother felt she did acknowledge the extent of the sexual abuse her children had been exposed to, and, she excused her lack of supervision of the children and failure to protect them stating that it was because she could not have been with them all day, all the time.
In the period from April, 1997 to the end of December, 1997, the mother was an active participant in family counseling as it was provided by the residential facility where the two oldest boys were residing. She did not continue this family therapy, being terminated because of her hostile, explosive conduct toward her son's therapist and her inability to support her son emotionally when he made disclosures of sexual abuse in their home.
In July, 1997, the mother began individual therapy which lasted for 10 sessions. She was cooperative in terms of her attendance. She worked on issues of communication with her DCF social worker and understanding how her personality effects her parenting skills. She did not continue counseling after the 10 sessions. The mother has consistently refused to engage in counseling on issues surrounding her own personal traumas and her parental responsibility for the neglect and abuse that occurred to all 3 of these children while in her care. The mother's excuse for not continuing with any individual counseling beyond a few CT Page 6462 sessions is the cost to her. However, a finding has been made, previously, by the local court that the cost did not pose a financial hardship to her. Further, she was referred by DCF to Medicaid for coverage. She never returned to DCF complaining of the issue again.
Throughout the evidence, the hostility that this mother felt toward her DCF social worker became a theme rivaling the issues surrounding the children. The mother's hostility appeared largely one-sided; the court notes that the discharge of the DCF worker's obligations in her position is a professional duty that requires personal detachment. Apparently, because of the continued hostility expressed by the mother to the worker, the worker initiated little direct personal conversation, choosing to communicate with the mother in writing on issues that might have been better worked on through the intimacy that comes from a two-sided, mutually participatory conversation. The mother's own hostility and defensiveness and denial of any significant parental neglect of her children combined, prevented her from assisting herself in her own rehabilitation.
The mother participated in three parent education programs through the McCall Foundation. The first was completed on March 12, 1997. It was a 3 visit, six hour program on "How to Talk So Kids Will Listen." The second was completed on February 11, 1997. It was a 3 visit, six hour program on "Positive Discipline." The third program was a 16 hour course over 6 weeks on "Developing Capable People" completed on March 6, 1997.
The mother sought and received support counseling from the Susan B. Anthony Project on 6 occasions (4 in person and 2 by telephone) over the period of one month, from March 20, 1998 to April 20, 1998. The counselor then told the mother her needs were beyond what they could provide. They recommended individual counseling elsewhere to the mother.
The mother's compliance with the expectations issued by the court, while not full, is not wholly inadequate. Mere compliance or partial compliance with expectations, however, is not the standard to be applied by the court in determining whether a parent has rehabilitated herself. The day to day attendance at programs is not the determinant of whether growth and rehabilitation has resulted in the individual. The mother resisted individual counseling of sufficient duration or length to permit exploration and growth on traumatic issues, involving CT Page 6463 both herself and her children. She desired and pursued counseling that only assisted her in dealing with DCF, an important but superficial problem.
The mother's lack of understanding of the specialized needs of her children was pointed out by the court-ordered evaluator, Dr. Mantel, a psychologist, in November, 1996. Also, she was not able to recognize their different developmental capacities. At that time he questioned whether the mother is capable of rehabilitation within a time consistent with the best needs of her children. It is important to observe that her capabilities are distinguishable from her desires. He found her avoidant and misleading in the interview process. She has a 9th grade education.
On July 8 and 9, 1998, the mother submitted to a second court-ordered psychological evaluation, performed by Dr. Anne Phillips. The purpose of the referral to Dr. Phillips was evaluation of current personality and intellectual functioning of the mother and her relationship with the three children subject of these petitions.
In the evaluation interview, the mother described her history of care with the children. She perceives herself having rehabilitated as a parent when the children were in state custody in Florida. She felt her problems supervising the children upon her return to Connecticut were minor. The mother took a series of tests as well as submitting to interviews as part of the evaluation. Her intellectual ability was measured in the low average range. Her personality test results are consistent with an individual who is vigilant and self-protective, not acknowledging herself to vary from generalized social norms and perceiving herself as a victim. Because of her low intellectual functioning, she is a concrete thinker who has difficulty understanding or adapting to new circumstances. Her response is to take very strong stances, such as her hostility to DCF and to her children's therapists when their conversations with her seem to challenge her. Because of her own troubled past and sense of herself as a victim her personality testing discloses her as someone who remains inclined to seek protection from a dominant controlling person. This makes her continue to be vulnerable to abusive relationships with men. She denied that she remains vulnerable but acknowledges a long past of abusive relationships with the fathers of all of her children. The mother continues to feel overwhelmed by people and institutions without the tools to CT Page 6464 deal with them.
The mother refused to accept that her children had been sexually abused repeatedly while in her care. She did not acknowledge the sexually precocious behavior of Christopher, Scott and Alicia. The mother cannot make an assessment of which men are safe around her children. Her own needs for security are paramount.
In observing the mother's interaction with the children, Dr. Phillips observed that she did not involve herself with Christopher and Scott. They were withdrawn from her and resisted her few attempts at conversation. She was not able to find a way to involve them with her and abandoned any attempts in favor of Alicia, who responded to her attention. She doted on Alicia who was receptive to her affection. The court notes that Dr. Phillips observed regarding the mother: "The enormity of her own emotional needs and preoccupation, however, interferes with her ability to see her children's experiences and needs as separate from her own. In sessions with the children, she seemed overwhelmed and confused by their differences and unable to construct ways of approaching them which were effective. Her continuing vulnerability to anger and despair interfere with her ability to be stably available to the children, and she remains vulnerable to episodes of even greater disorganization should emotional or circumstantial complications intensify. In such circumstances, [the mother] lacks coping mechanisms or flexible [sic] and is apt to be immobilized or involved in frantically unproductive activity, in the process of being unavailable to the needs of her children." Dr. Phillips found the mother's personality disorder resistant to treatment. She lacks the cognitive tools to change. Although she verbalizes the right things about parenting to providers and other adults, she does not have the ability to integrate the information and change. "She knows the words, the music eludes her." Dr. Phillips felt she needs long term psychotherapy to begin the process if change because her problems are so entrenched. Dr. Phillips did not recommend the return of any of the children to their mother's care. Dr. Phillips' evaluation was over 1 1/2 years after Dr. Mantell's evaluation. From one evaluation to the next, the mother had not made any significant strides in her rehabilitation of herself. "The psychological testimony from professionals is rightly accorded great weight in termination proceedings. In re Juvenile Appeal(Anonymous, 177 Conn. 648, 667, 420 A.2d 875 (1979). . . . [T]he testimony of child psychologists is a factor which may properly CT Page 6465 be considered by the trial court when determining whether a parent's mental deficiency interferes with the parenting functions necessary to deal effectively with a child. In re David E., 4 Conn. App. 653, 657, 469 A.2d 229 (1985)." In re NicolinaT., 9 Conn. App. 598, 605 (1987). The court finds that DCF has proven by clear and convincing evidence that the mother, Shelly D. has failed to rehabilitate herself such that she could assume a responsible parenting role in the near future. The court must consider still, however, whether she could do so within a reasonable time given the age and needs of each of the children. This is an issue of fact. In re Davon M., 16 Conn. App. 693, 696
(1988).
Christopher is the third child of the mother, Shelly. It is important to note by way of background for him that he has two older brothers, Eric and Kevin. Eric and Kevin were sexually abused by Christopher's father. They are both placed in residential homes. They were both initially at Brightside, but now one has been moved to Stetson. Both are being treated for behavioral problems that include sexual perpetrator and victim issues. Eric is about 4 1/2 years older than Christopher. Kevin is about 3 years older than Christopher. Christopher was born May 25, 1990.
Christopher is developmentally delayed in both the social and emotional areas. In 1996, the foster mother walked in on him with his pants down and with Scott's pants down (Scott was then 3 1/2 years old). It appeared that Christopher was preparing to mount Scott who was bent over. When his foster mother confronted him as to what he was doing. He reported to her that his brothers Eric and Kevin used to do this to him. On two other occasions in the foster home he was interrupted in trying to engage in sexual conduct. He reported also that the four boys (Eric, Kevin, Christopher and Scott) all slept together at his mother's home and engaged in touching behavior with each other.
In 1996, Christopher reported that his father Chris is in jail and his mother's boyfriend Marty is his father as well. Christopher was initially reticent to answer inquiries about sexual issues because he feared getting in trouble with his foster mother who had banned sexual contact or conversation. Ultimately he was able to engage in the conversation with Dr. Mantell. He said that Eric used to touch his private parts and that Eric got slapped by his mother for doing it. He stated that Kevin stopped because he knew he would get in trouble. CT Page 6466 Christopher stated also that Marty touched his private parts and his mother knew it and saw it happening. The mother told Marty to stop; however, Marty continued doing it to Christopher while he lived in his mother's house. Marty was also touching Scott's private parts and was caught by the mother who told him to stop.
Christopher lived with is mother from his birth on May 25, 1990 until he was placed in a foster home in April, 1994, and stayed there for approximately one year. He was with his mother from mid — 1995 until he was removed again to foster care in April, 1996. Christopher's testing in early 1997 shows him to have significant behavioral problems, including lying and problems with rules. He has been in foster care ever since, until, February, 1999 when he was placed in a residential home by DCF.
Christopher has not seen his father since February, 1992. While he lived with his mother, she had Scott L. living with her before his first removal to foster care, and, Marty H. living with her upon his return to her until his second removal to foster care.
While Christopher was in foster care, he had a lot of difficulty behaving in the classroom. He has received individual counseling since June, 1997. From August 1, 1997 to October 7, 1997 he was involved in a partial hospital program. There was limited success described. He remained troubled with impulse control problems and acting out sexually. Christopher had trouble speaking about his problems. He continued in individual therapy. In therapy with his siblings he presented as a child who had a low threshold for frustration. He was bossy and controlling of his brother Scott. In July, 1998 Christopher reported that he does not want to live with his biological mother and does not miss her. In the summer of 1998, he remained controlling of Scott and was caught lying by his foster mother. The therapist found him guarded and evasive. In October, 1998, Christopher told his therapist that he wanted to "clean his heart, that it was dirty." The therapist concluded Christopher had been a victim of sexual abuse.
DCF decided to seek residential placement for Christopher. He was placed at Harmony Hill in early 1999. At his initial therapy he repeatedly stated that he did not want to live with his mother, because she yells at the children and hurts them and does not keep them safe from private touching. He cannot talk about his problems or emotions except when he is in therapy. Young CT Page 6467 Christopher at 8 years old told his therapist. . . . that the door is open when he is in therapy, but butterflies and birds fly around and make him feel bad so that he has to shut the door and discontinue the conversation." He admits that he hit and pushed Scott and Alicia and admits to a long and sad litany of sexual contact with Scott and Alicia.
Christopher is a severely traumatized child. He is very detached from his mother. He demonstrates no genuine attachment to his mother and has repeatedly expressed that he does not want to be taken care of by her in the future. He does not miss contact with her.
Scott was born November 8, 1992. When he was removed from his mother in April 1996, he was diagnosed with scabies and scarlet fever. While in foster care he had continued colds and throat infections. In August, 1996 he had his tonsils and adenoids removed and has fully recovered.
Scott was 16 months old the first time he was removed from his mother's care. He was 2 years, 2 months old at his return to her care. He was 3 years, 9 months old when he was again removed in April, 1996. He has now been in foster care for three years, currently. He has spent almost half of his life in foster care. In foster care, he was initially placed with his younger sister Alicia. Christopher was united with them there a few months later, until his placement at Harmony Hill.
When Scott was first placed in his foster home she engaged in secularized behavior, touching his younger sister's genitals, and physically displaying humping on his sister and stuffed animals, and engaging in masturbation motions. She told his foster mother that Eric and Kevin had touched his private parts and put things in his bottom. In his evaluation with Dr. Mantell, he reported to Dr. Mantell that Eric and Kevin touched him on his pee-pee and he told his mother. He was cautious about discussing the facts of this further, fearful that he would get in trouble with his foster mother.
In the 1997 evaluation, Scott reported that he had two moms, naming his biological and foster mothers. He named his foster father and Marty as his fathers. He did not name his biological father.
In visits with his mother, Scott has been observed to be CT Page 6468 distant and unresponsive to affection or attempts to involve him in conversation. In therapy, over time, Scott has stated that all three of his older brothers have sexually and physically abused him. He also remembers seeing Christopher thrown down the stairs by his older brother. Scott has difficulty expressing his feelings. He has been I dominated by Christopher. He is very insecure and in need of consistent nurturance and a sense of safety.
Alicia was born March 28, 1994. She was placed in foster care when she was one month old. She was returned to her mother 10 months later.
When Alicia was removed from her mother again in April, 1996, she was diagnosed with scabies, impetigo, and scarlet fever. Alicia has been with her biological mother only about one year of her life.
In foster care, Alicia has now remained for over two years in the same placement with her brother Scott, where Christopher also was for a period of time. It is the only placement she has had. Alicia is reported to have come into foster care with sexualized behavior, making humping motions and motioning her bottle in and out of her vagina when her diaper was changed. There is no evidence that she was subjected to any physical trauma, herself. This behavior has disappeared over time and it was noted that by the time of her evaluation for therapy in July, 1998, it was nonexistent.
Alicia has visited regularly with her mother and in group visitations has been the subject of her mother's affection and dotage. She is excited to see her mother but also parts easily from her at the end of visits. Her mother tends to communicate with her in baby talk rather than encouraging her language development.
When Alicia was evaluated by Dr. Mantell in early 1997, she was substantially delayed in her language development and self-help skills. Alicia commenced therapy in July, 1998. Her school complained of aggressive behavior by her; it was not noted at the foster home. She is in a special class in school to work on improving her language delays. Because of her developmental delays, Alicia received Birth to Three services and commenced Head Start in 1997. CT Page 6469
Alicia's therapist concluded that the traumas experienced and observed by her in her earlier life of neglect and abuse are being displayed in her behavior as she matures. She has an inability to communicate verbally when she needs something; she resorts to whining and screeching. Her language deficiencies are significant. Alicia was settling down and improving her behavior in school until late in the Fall 1998. Her behavior began to deteriorate as the issues of separation of Christopher to go to a residential facility from their foster home began to arise. She remains in therapy.
The mother does not recognize or accept that Alicia has been the subject of abuse or the victim of her neglect. The mother was present at a therapy session for Kevin in November, 1998 when he was discussing Eric touching baby Alicia's genitals and that he had told his mother and she did nothing. The mother exploded emotionally and was hostile to Kevin, denying that these events occurred. The mother failed to protect her children and refuses to acknowledge the victimization of her children and her responsibility for it.
In the period from February, 1997 until the hearing, a period spanning two years, the mother had attended approximately 17 counseling sessions, total, with several different therapists. This is insufficient to create a framework of continuity of, and commitment to, the care necessary for her to rehabilitate herself.
In January, 1998, the mother terminated her relationship with Marty H. Christopher's disclosures regarding Marty had been in February, 1997. Her failure to discontinue her relationship with him at that point is tacit denial of the belief in Christopher's credibility, or. putting her needs first. No other reasonable alternative exists. "While acts of commission in a case such as this are fairly ascertainable through direct evidence, proof of acts of omission tends to be elusive. The young age of the children and the fact that their mistreatment occurred in the privacy of the family home demand that proof of one parent's failure to halt the mistreatment must rest largely on circumstantial evidence." In re Juvenile Appeal (85-2),3 Conn. App. 184, 191 (1985). The children's victimization in the mother's home is proven by clear and convincing evidence. The court finds also by clear and convincing evidence that the mother failed to protect each of her three children from sexual victimization, knowing that it had occurred in her home. The CT Page 6470 court finds that DCF has proven by clear and convincing evidence that the mother, Shelly D. has by her acts of omission, denied each of the three children the care and control necessary for their respective physical, moral and emotional well-being.
Each of these three children is struggling emotionally. Dr. Phillips has emphasized with their respective special needs how crucial permanency is for them at home. They are each so terribly scarred and upset and insecure that the uncertainties of their futures only aggravates their traumatized existences. Their mother, Shelly D. has had almost three years from their removal to rehabilitate herself. No significant progress has been made. Dr. Phillips, and earlier Dr. Mantell, have each recommended long term therapy to help her deal with her own deeply seeded tragic problems; to try to expand herself beyond her limitations as a parent. These limitations come from mental deficiencies and historical trauma. Her conditions have existed many years. None of the children can wait for the hope of her rehabilitation at some far away indeterminate date. They need to settle into secure homes immediately. The court finds that DCF has proven by clear and convincing evidence that the three children, Christopher, Eric and Alicia have been previously adjudicated neglected, and the mother, Shelly D. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time considering the ages and needs of Christopher, Eric and Alicia, that she could assume a responsible position in the life of any of them.
Required Findings
Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding the following. Much of these findings have been covered earlier in this opinion and the findings below merely supplement the findings of fact already made above.
(1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent.
The services provided by DCF have been offered in a timely manner. DCF has offered referrals for individual counseling, family counseling through the older boys' placement, parenting programs, and education on parental issues through the Parents CT Page 6471 With Mental Illness program. The mother has failed to follow through on individual counseling with any tenacity or stability with one counselor for any extended period of time. DCF has offered visitation consistently to the mother. No services were offered to either of the fathers, neither of whom have participated in these proceedings.
(2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
DCF has made reasonable efforts to unite the family through referral for services and provision of visitation. The mother's lack of acknowledgment of her responsibility for the injuries to her children and their neglect has continued to make her home an unsafe place for her children to live.
(3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The expectations have been listed in the body of this opinion as the applicable court orders. The mother has not complied with individual counseling. She has not complied with the family counseling through the older boys because her upsetting behavior to Kevin when he made the disclosure of sexual behavior among the children caused portions of it to be terminated. She has moved several times and is currently unemployed.
There are no orders addressed to either of the fathers, who have not participated in these proceedings.
(4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Christopher has expressed that he does not want to ever live with his biological mother again. He had emotional ties to his foster mother but had to be placed residentially for his own growth and because his behavior was unhealthy for Scott and Alicia also residents there. Christopher has no emotional ties to his biological father. CT Page 6472
Scott's emotional ties with his mother are difficult to discern. When he visits with her, he tends to be withdrawn and unresponsive to her. He will go through entire visits without communicating with her, focusing only on his siblings in the room. Since Christopher was residentially placed in February, 1999 and he is not part of the group visits, there is somewhat more contact between Scott and his mother at visits. He does not express great excitement at seeing her and separates easily from her. Scott has no ties to his biological father.
Alicia has not ever lived with her mother for much more than one year. She has lived with her, in total, for about 13 months. She is very attached to her foster mother and very affectionate to her. She shows affection as well to her mother and appears excited to see her. She leaves her easily. Alicia has no emotional ties to her biological father.
(5) the age of the children. Christopher, born May 25, 1990 is 8 years old, almost nine. Scott, born November 8, 1992 is 6 years old. Alicia, born March 28, 1994 is four years old at the time of trial, just short of her 5th birthday which has occurred while this decision was pending.
(6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to:
(A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions. The mother has maintained her contact with the children as permitted by DCF. Neither of the fathers have maintained contact with their children.
(B) the maintenance of regular contact or communication with the guardian or other custodian of the child. Neither of the fathers have maintained contact with DCF, the custodian of the children. While the mother has maintained contact with DCF the quality of that contact has been poor because she has been so hostile and distrustful of the Department.
The mother has not made efforts to adjust herself so that her CT Page 6473 children could come home with her in the forseeable future. She has gone through the motions of attending programs. She will not and has not committed herself to counseling. She quits soon after she started, she has no follow through and refuses to engage in the difficult issues of her own past and the care of her children, all of which are necessary for her to do in order for her to be able to provide a safe, nurturing and caring home for her children.
(7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
The mother has not been prevented from maintaining a meaningful relationship with any of her children. Neither of the fathers have attempted to maintain a meaningful relationship with any of the children.
These three children have experienced abuse and neglect. They have not been protected. They have waited in foster care for years and still their mother does not understand their needs or how to meet them. These children are each troubled and suffering in their childhood because they were not protected and nurtured. Their insecurity is profound. They need permanency at home. They need to know where home is and will be in the future so that they can heal and grow in a healthy and safe setting. This is not with their mother, so it must be elsewhere.
These findings are made after considering each child's sense of time, need for a secure and permanent environment, the relationship that each has with the respective foster parents, and the totality of all the circumstances. In re Juvenile Appeal(Anonymous), 177 Conn. 663, 667-68, 673 (1979). See also, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of theChild 99 (1979).
Based upon the foregoing, the court finds by clear and convincing evidence that it is in the best interest of Christopher L., Scott L., and Alicia L. to terminate the parental rights of their biological mother, Shelly D. The court finds by clear and convincing evidence that it would be in the best interest of Christopher to terminate the parental rights of his biological father Christopher L. The court finds that it would be CT Page 6474 in the best interest of Scott and Alicia to terminate the parental rights of their biological father, Scott L. It is ordered that the parental rights of the biological mother, Shelly D. in and to Christopher L., Scott L. and Alicia L. are hereby terminated. It is ordered that the parental rights of the biological father, Christopher L. in and to Christopher L., the minor, are hereby terminated. It is ordered that the parental rights of the biological father, Scott L. in and to Scott L., the minor, and Alicia L. are hereby terminated.
It is further ordered that the Commissioner of the Department of Children and Families is appointed the statutory parent for the purpose of securing an adoptive family for each of these three children. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
MUNRO, J.